IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SYNSUS PRIVATE LABEL PARTNERS, LLC,    )
                                       )
              Plaintiff,               )
                                       )
      v.                               )    C.A. No. _____
                                       )
SOILGENIC TECHNOLOGIES, LLC,           )    **JURY TRIAL DEMANDED**
                                       )
              Defendant.               )

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff Synsus Private Label Partners, LLC ("Synsus") brings this Complaint against Defendant Soilgenic Technologies, LLC ("Soilgenic"). In support of this Complaint for Declaratory Judgment and Other Relief, Synsus alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory and other relief arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; the North Carolina Abusive Patent Assertions Act, N.C. Gen. Stat. § 75-140 *et seq.*; and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

2.     Founded in 1976, Synsus is a leading chemical manufacturer that provides research and development, specialty chemical manufacturing, and private-label custom packaging services for the agricultural, turf and ornamental, and consumer lawn and garden markets. Synsus specializes in the formulation and production of specialty liquid fertilizers, nitrogen stabilizers, foliar micronutrients, colorants, adjuvants and surfactants, and other liquid nutritional and plant health products.

3.     Synsus's customers are other companies in the agricultural, turf and ornamental, and consumer lawn and garden markets, who collaborate with Synsus to develop custom chemical

formulations, as well as manufacturing, packaging, and supply chain processes.  These companies, in turn, market Synsus's developed products and formulations under their own brand label and sell them to end customers through their specific retail channels.

4.      Among other benefits, Synsus's products and formulations reduce nitrogen loss during fertilizer application, which allows for more efficient use of nutrients, ultimately protecting the environment, yield, and profits.

5.      Synsus has long been an innovator in the chemical manufacturing space; it frequently partners with distributors and product companies to develop formulations that solve real challenges in the market.  Synsus has several patents generally directed to the use of nitrification and/or urease inhibitors in combination with fertilizers.

6.      Synsus is headquartered in Houston, Texas.  Synsus also maintains several other laboratories, manufacturing plants, and offices, including in Raleigh, North Carolina; Pipestone, Minnesota; Sylacauga, Alabama; Lakeland, Florida; and Tempe, Arizona.  Synsus's facility in Raleigh, North Carolina is Synsus's innovation headquarters, and is where Synsus conducts all of its basic research and formulation development work—including the work relating to the nitrogen stabilizer products that are implicated by this action.

7.      On information and belief, Soilgenic is not an operating entity.  Soilgenic does not engage in the manufacturing or the provision of goods or commercial services.  In other words, Soilgenic does not make or sell any fertilizer products, and does not have any revenue streams other than licensing revenue from its patent portfolio.

8.      This action arises out of Soilgenic's repeated efforts to coerce Synsus to license Soilgenic's patents.  At least since initially accusing Synsus of patent infringement in August 2025,

Soilgenic has engaged in coercive, bad-faith conduct in an attempt to force Synsus to agree to an unnecessarily expansive license on unreasonable terms.

9. For example, in an initial call between Synsus and Soilgenic, Soilgenic accused Synsus of infringing its patents after it already accosted a Synsus customer regarding the alleged infringement. Soilgenic then threatened to bring Synsus's customers into litigation if Synsus and Soilgenic could not resolve this dispute.

10. Soilgenic then sent Synsus a letter in August 2025 accusing Synsus of infringing 22 patents. However, Soilgenic did not demonstrate that it owned the patents, and it did not provide any claim charts or otherwise explain the basis for the alleged infringement. When Synsus asked for more detailed information about Soilgenic's allegations, Soilgenic resisted. Weeks later, Soilgenic eventually produced claim charts for fewer than half of the 22 identified patents.

11. Synsus's analysis of Soilgenic's claim charts revealed that Soilgenic's theories of patent infringement are meritless, and that the asserted patents are also invalid and, in some cases, unenforceable.

12. Synsus explained how Soilgenic's claims were meritless. However, Soilgenic ignored Synsus's analysis and sent Synsus its licensing terms, which included those patents that Synsus contended were not infringed, invalid, and/or unenforceable. Soilgenic's initial license terms identified initial fees between $1,000,000-$1,500,000 and royalty percentages between 3-5% of gross revenue of the licensed products. Soilgenic then revised its offer for an upfront license fee of $1,500,000 and a royalty of 3% and asserted that its offer is non-negotiable.

13. With the looming threat of Soilgenic going after Synsus's customers, and in a good faith effort to try to avoid litigation, Synsus asked Soilgenic to explain its proposed fees and identify how the fee was attributed to each of the four patent families that were identified in

3

Soilgenic's proposed license.  Synsus also requested Soilgenic to provide the financial terms including identification of the upfront fee given to Soilgenic's licensees.  However, Soilgenic declined and has not provided all of this information to date despite multiple requests.  Soilgenic has continued to stymie Synsus's efforts to reasonably engage in negotiations to resolve this matter.

14.     Soilgenic's anticompetitive threats to interfere with Synsus's customer relationships and engage in litigation if Synsus does not take a license on Soilgenic's terms are plainly intended to coerce Synsus to enter into a license on terms that are not reasonable in view of Soilgenic's meritless patent assertions.  These threats are designed to unfairly harm Synsus's business and offend the notion that market participants should be free to fairly, ethically, and freely compete in the marketplace.

15.     Accordingly, Synsus seeks a declaratory judgment that it does not infringe four of Soilgenic's patents:  U.S. Patent No. 9,650,306 ("the '306 patent"); U.S. Patent No. 10,633,300 ("the '300 patent"); U.S. Patent No. 10,494,311 ("the '311 patent"); and U.S. Patent No. 11,021,414 ("the '414 patent") (collectively, the "Asserted Patents"), which are representative of the patent families that may have any relevance to Synsus.  Synsus additionally seeks a declaratory judgment that the Asserted Patents are invalid, and that the '414 patent is unenforceable due to inequitable conduct.  Synsus further seeks compensatory and injunctive relief under the North Carolina Abusive Patent Assertions Act and the North Carolina Unfair and Deceptive Trade Practices Act to obtain a remedy for Soilgenic's bad-faith patent assertions and licensing conduct.

## THE PARTIES

16.     Plaintiff Synsus Private Label Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business

at 18211 Katy Freeway, Suite 325, Houston, Texas 77094.  Synsus also maintains a place of business at 621 Hutton Street, Raleigh, North Carolina 27606.  Synsus conducts business nationally, including in Delaware and North Carolina, among other states.

17.     On information and belief, Defendant Soilgenic Technologies, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 1700 66th St. North, Suite 404, St. Petersburg, Florida 33710.  On information and belief, Soilgenic also maintains a place of business at 407 Ferndale Boulevard, High Point, North Carolina 27262, and additionally in Winston-Salem, North Carolina.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of these claims under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Additionally, this Court has subject-matter jurisdiction over Plaintiff's request for declaratory relief under 28 U.S.C. §§ 2201 and 2202.

19.     An actual controversy exists between Synsus and Soilgenic at least as to (1) whether any of Synsus's products infringe the Asserted Patents, and (2) whether the Asserted Patents are valid and enforceable.

20.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims asserted or that may be asserted, as those claims are so related to Synsus's claims within the original jurisdiction of this action that they form part of the same case or controversy under Article III of the United States Constitution, and derive from a common nucleus of operative facts.  In addition, because Synsus's state law claims relate directly to Soilgenic's allegations that the Asserted Patents are infringed, all of Synsus's claims would ordinarily be expected to be tried in one judicial proceeding.

21.   This Court has personal jurisdiction over Soilgenic because Soilgenic is incorporated in this District as a Delaware limited liability company.

22.   Venue is proper in this Court under 28 U.S.C. § 1391 because Soilgenic resides in this District, and is subject to this Court's personal jurisdiction, by virtue of its status as a Delaware limited liability company.

**FACTUAL BACKGROUND**

**A.  Soilgenic and Its Patent Portfolio**

23.   On information and belief, Soilgenic was formed in Delaware as a privately-held limited liability company in 2020.

24.   On information and belief, Soilgenic does not engage in the manufacturing or the provision of goods or commercial services.

25.   On information and belief, Soilgenic seeks to leverage the high costs of defending against patent infringement claims in order to obtain payments, nominally designated as license fees or settlements.

26.   Soilgenic purports to have acquired rights to numerous patents—including the Asserted Patents—in 2022 from a family of companies including Eco Agro Resources, LLC, Eco World Research and Development Group, LLC, Worldsource Enterprises, LLC, and Eco World Group, LLC (collectively, "Eco").

27.   In 2016, Eco entered into a Restated Supply and License Agreement ("RSLA") with Synsus's predecessor company, Hocking International Laboratories, LLC ("Hocking"), which covered U.S. Patent No. 9,732,008, then owned by Eco.  In 2020, Eco and Hocking entered into a Settlement Letter Agreement ("SLA"), which clarified the rights and obligations of each party under the RSLA.

28.     On information and belief, Eco assigned various patents to Soilgenic following the execution of the SLA.  However, on information and belief, Soilgenic is not a successor-in-interest under the SLA and would not have standing to bring a claim under the SLA.

### B.  Soilgenic's Demand for a License

29.     In the summer of 2025, Soilgenic began contacting Synsus in an attempt to demand a license to Soilgenic's patent portfolio.  During an initial call between the parties, Soilgenic accused Synsus of infringing its patents after Soilgenic already had contacted a Synsus customer regarding the alleged infringement.  Soilgenic then threatened litigation against Synsus and Synsus's customers if Synsus and Soilgenic could not resolve this dispute.

30.     On August 21, 2025, Soilgenic sent a notice letter (the "Notice Letter") to Synsus, alleging that several of Synsus's products and compositions infringe the claims of 22 patents.  In particular, the Notice Letter identified the following products and compositions as allegedly infringing those 22 patents:  Vol Terra; V-Gard, D-Gard, and Evergard (collectively, the "Nitrogard Family"); HiCharge NBPT and HiCharge DCD; and NBPT 20%, NBPT 26.7%, NBPT 40.4%, DCD 28%, and DCD 34% (collectively, the "Nitrogen Stabilizers").  The Notice Letter was sent from Soilgenic's counsel who, according to the letter, is located in Charlotte, North Carolina.  A true and correct copy of the Notice Letter is attached hereto as **Exhibit A**.

31.     Soilgenic's Notice Letter did not identify which specific claims of the 22 identified patents it believed were infringed, nor did it provide any factual allegations concerning the specific areas in which Synsus's products and compositions are allegedly covered by specific, identified claims in those patents.  In fact, Soilgenic did not provide any basis other than "information and belief" for its allegations of infringement. Ex. A at 2.

7

32.    On information and belief, Soilgenic did not conduct an adequate analysis comparing the claims of the 22 identified patents to Synsus's products and compositions prior to sending the Notice Letter to Synsus.

33.    In addition, although Soilgenic sent its Notice Letter under the guise of a dispute resolution procedure set forth in the SLA, Soilgenic made no attempt to show that Eco assigned its rights to the SLA to Soilgenic, or that Soilgenic otherwise had standing to assert the patents identified in the Notice Letter.  *See generally* Ex. A.

34.    Synsus replied to Soilgenic's Notice Letter on September 5, 2025.  Synsus explained that more information was needed for Synsus to evaluate a range of issues, including what Soilgenic's infringement allegations are, the basis for those allegations, whether Soilgenic is the rightful owner of the patents it asserts, and whether Soilgenic had conducted a reasonable investigation into any relevant prior art.  Accordingly, Synsus articulated numerous specific requests for information regarding Soilgenic's asserted patents.  Most fundamentally, Synsus requested that Soilgenic identify which claims of each patent it believed were infringed and provide a claim-by-claim, element-by-element analysis identifying and describing the basis for the alleged infringement.

35.    In a response letter dated September 12, 2025—again sent from Soilgenic's counsel in Charlotte, North Carolina—Soilgenic refused to provide any of the information Synsus requested.  Despite Synsus's clear demand for more information regarding Soilgenic's infringement allegations, Soilgenic refused to provide further elaboration, asserting that because its Notice Letter associated each accused Synsus product and composition with one or more Soilgenic patents, the Notice Letter provided enough information for Synsus to investigate and respond to Soilgenic's allegations.

36.     As to Synsus's request for an identification of asserted claims, Soilgenic asserted that the table it provided in the Notice Letter was sufficiently detailed, notwithstanding that Soilgenic's Notice Letter did not identify **any** specific claim of any patent. *See generally* Ex. A. Similarly, as to Synsus's request for a claim-by-claim, element-by-element analysis, Soilgenic dismissed that request because its August 21 notice supposedly provided enough specificity regarding Soilgenic's allegations.

37.     Synsus promptly responded six days later to Soilgenic's refusal to provide the requested information in a letter dated September 18, 2025 ("September 18, 2025 Letter"). As Synsus pointed out, Soilgenic's Notice Letter identifies over 20 patents that Soilgenic alleges are infringed—totaling more than 400 claims. But despite those sweeping allegations, Soilgenic had not identified a single specific claim that was allegedly infringed, nor had Soilgenic identified any evidence to support its infringement allegations.

38.     Eventually, on October 7, 2025—more than six weeks after sending its Notice Letter—Soilgenic produced ten claim charts to Synsus; nine of the charts related to patents identified in the Notice Letter, and the tenth chart related to a patent application (U.S. Patent Application No. 17/404,932) that had not previously been identified to Synsus. Soilgenic's claim charts also referenced, for the first time, two new accused products—the Verdesian Trident® family of products and Innvictis Trivictin™—that did not appear in the Notice Letter.

39.     While Synsus was evaluating Soilgenic's claim charts, Synsus repeatedly requested Soilgenic to demonstrate that it was assigned Eco's rights to the SLA.

40.     Soilgenic eventually produced to Synsus a redacted agreement that it contended supported standing, but that agreement had no mention of the SLA nor did it demonstrate that Soilgenic was properly assigned Eco's rights under the SLA. Synsus pointed out the deficiencies

in Soilgenic's proof and reserved all rights to dispute whether the SLA was assigned to Soilgenic. Soilgenic never came forth with additional information to prove that it was, in fact, assigned Eco's rights under the SLA.

41.     On November 14, 2025, Synsus responded by letter to the analysis contained in Soilgenic's claim charts ("November 14, 2025 Letter").  Synsus asserted, "Soilgenic has no viable claim of infringement for any of the Asserted Patents." Ex. B at 2.  The accused compositions, the Nitrogard Family and Nitrogen Stabilizers, are not products nor are they offered for sale.  *Id.*  And the other accused products—the Vol Terra, Verdesian Trident® family of products, and Innvictis Trivictin™—do not contain all the claim limitations in the patents in which Soilgenic provided claim charts.  *Id.*  Many of the claim charts included gaps in the infringement analysis, and Soilgenic tried to fill in those gaps with citations to Synsus's patents.

42.     Soilgenic provided no basis as to why it would be appropriate to base its infringement contentions on Synsus's patents.  A true and correct copy of Synsus's November 14, 2025 Letter is attached hereto as **Exhibit B**.

43.     Synsus's November 14, 2025 Letter further explained that many of the patents Soilgenic asserts are in the same family as the now-invalid U.S. Patent No. 10,221,108 ("the '108 patent").  *Id.* at 2.

44.     On August 10, 2020, the Patent Trial and Appeal Board ("PTAB") entered a Final Written Decision finding all claims of the '108 patent to be unpatentable in a post-grant review proceeding.  *Solvay USA Inc. v. Worldsource Enters., LLC*, No. PGR2019-00046, Paper 10 (P.T.A.B. Aug. 10, 2020).  The U.S. Court of Appeals for the Federal Circuit summarily affirmed the PTAB's decision under Federal Circuit Rule 36. *Worldsource Enters., LLC v. Vidal*, No. 2021-1041, 2022 WL 2092776 (Fed. Cir. June 10, 2022).  Because many of the asserted claims are

materially similar to the claims of the '108 patent, Synsus asserted that the prior art raised in PGR2019-00046 would likewise invalidate the claims Soilgenic asserts against Synsus.  Ex. B at 2–3.

45.    Synsus added that "Soilgenic and/or the predecessor of these patents had a duty to inform the USPTO [U.S. Patent and Trademark Office] of the [PTAB's] and the Federal Circuit's decisions invalidating the '108 patent, yet these decisions were not disclosed to the USPTO in the later filed continuing applications that resulted in patents that Soilgenic now asserts.  This omission is fatal to the enforceability of the patents in this family that issued after the '108 patent." *Id.* at 3.

46.    Instead of addressing or disputing the issues raised by Synsus in its November 14, 2025 Letter, on November 21, 2025, Soilgenic demanded a call with Synsus, insisting that counsel not be present.  Because Synsus's November 14 Letter made clear that Soilgenic did not have a viable claim of infringement, Soilgenic threatened on the call that it did not want to have to escalate the dispute by going to the market and Synsus's customers if Synsus would not take a license on Soilgenic's terms.  This threat was plainly intended to convey that Soilgenic would use Synsus's customer relationships as a means to generate negotiation leverage.

47.    Approximately one month later, on December 19, 2025, Soilgenic insisted the parties discuss—again without counsel present—a comprehensive go-forward agreement.

48.    Instead of addressing Synsus's substantive positions on the merits of Soilgenic's claims, Soilgenic contended "our time is better spent accepting, as a premise, that Synsus has exposure."  A true and correct copy of Soilgenic's December 19, 2025 email is attached hereto as **Exhibit C**.

49.     On December 22, 2025, the parties held a conference call, during which Soilgenic informed Synsus that three other companies had licensed its patent portfolio.  On the call, Soilgenic tried to convince Synsus that it would be beneficial for Synsus to take a license to its patents.

50.     On January 5, 2026, Soilgenic provided Synsus with a non-exclusive licensing proposal ("January 5, 2026 License Offer"); this proposal demanded that Synsus pay license fees ranging from $1 million to $1.5 million in upfront fees, plus ongoing royalties of 3% to 5% of gross revenue, for a package of more than forty patents across four patent families, with the last patent expiring in 2040.

51.     In response to Soilgenic's licensing proposal, on January 14, 2026, Synsus asked, *inter alia*, for Soilgenic to provide the proposed license fee attributable to each of the four families identified in Soilgenic's proposal, and to provide the financial terms under which Soilgenic's patents have been previously licensed to other entities.

52.     On February 20, 2026, Soilgenic finally responded, but refused to provide substantive and complete answers to Synsus's questions.  Instead, Soilgenic provided a more detailed, proposed term sheet, asserting that its offer was "to move from possible litigation".  The revised term sheet demanded a one-time fee of $1.5 million plus a royalty of 3% of gross sales ("February 20, 2026 License Offer") and provided additional terms and conditions that were not presented in Soilgenic's January 5, 2026 License Offer.  A true and correct copy of Soilgenic's February 20, 2026 email is attached hereto as **Exhibit D**.

53.     On March 31, 2026, the parties held another call, without counsel present, in which Soilgenic represented that it would provide answers to Synsus's outstanding questions.

54.     On April 10, 2026, Soilgenic confirmed that its February 20, 2026 License Offer was non-negotiable.  To date, Soilgenic has not identified the initial fees its other licensees have

12

paid, how it derived its licensing fee, nor has it addressed the issues Synsus raised in its November 14, 2025 Letter.

55.    In addition, as of the filing of this Complaint, Soilgenic has not provided claim charts or any substantive infringement analysis for the remaining patents identified in the Notice Letter or for many of the patents identified in its license offer.

56.    Accordingly, Soilgenic's licensing demands of a seven-figure sum plus an ongoing royalty are unreasonable and are not based on a reasonable estimate of the value of the license.

57.    Soilgenic knew or should have known that its patent infringement allegations against Synsus are meritless.  Synsus explained to Soilgenic how Synsus's products do not infringe the claims of Soilgenic's patents, and how Soilgenic's patents are also invalid and/or unenforceable.

58.    Because Soilgenic refused to address Synsus's reasons as to why Soilgenic's infringement allegations are meritless, refused to explain the licensing fees for each patent family, refused to narrow its license offer to only the patent families that may be applicable to Synsus's business, has offered licensing terms that are non-negotiable, made multiple threats to go after Synsus's customers if this dispute was not resolved, and threatened litigation, Soilgenic has acted in bad faith in its attempt to coerce Synsus into taking a license on unreasonable terms.

59.    If Soilgenic were to accuse Synsus's customers of infringing its patents by selling products made by Synsus, those accusations would be highly disruptive to Synsus's business and relationships with its customers.  Such accusations would tarnish Synsus's reputation in the industry, harm Synsus's business and customer relationships, and could divert business to Synsus's competitors.  Synsus's customers would also be forced to incur legal expenses investigating and defending against such accusations, each of which would be objectively baseless.  Knowing this,

Soilgenic has threatened to interfere with Synsus's business relationships and competitive position in the marketplace in an unscrupulous effort to unfairly exert leverage in the parties' licensing negotiations—largely because Soilgenic's patent infringement allegations have no merit, and are objectively baseless.

### C. The Asserted Patents

60.    Soilgenic's patent portfolio consists of four families of patents that aim to improve fertilizer efficiency:  (1) the "Nitrification Inhibitor Family"; (2) the "Poly (Organic Acid) Family"; (3) the "Dry Additive Family"; and (4) the "Urease Inhibitor Family".  Regarding the "Dry Additive Family," Soilgenic eventually admitted that it is not related to the on-going legal issues.

61.    As described herein, Soilgenic accuses Synsus of infringing its patents by supplying formulations for various products and through various Synsus technologies listed on its website.

### 1. The Nitrification Inhibitor Family

62.    The Nitrification Inhibitor Family generally purports to claim liquid formulations comprising nitrification inhibitors dissolved in organic solvents with colorants which can be added to fertilizers to increase fertilizer efficiency.  Nitrification inhibitors are chemical compounds that prevent nitrogen loss in soil to increase nitrogen use efficiency.  Organic solvents are used to dissolve the inhibitors and create a composition to add to fertilizer.  The solvents selected are environmentally safe, avoid clumping, and do not degrade the inhibitors.  This family attempts to solve issues previously experienced by the field with nitrification inhibitors including issues regarding safety and toxicity, cost, storage life and stability, clumping of fertilizer granules, and degradation of the nitrification inhibitors.

### a. U.S. Patent No. 9,650,306

63.     The '306 patent is titled "Compositions and Methods Comprising Nitrification Inhibitors Containing a Mixture of Protic and Aprotic Solvent Systems."  The '306 patent was filed on April 17, 2015 and issued on May 16, 2017.  The '306 patent claims priority to April 17, 2014.  On information and belief, Defendant claims to own all rights, title, and interest in the '306 patent.  A true and correct copy of the '306 patent is attached hereto as **Exhibit E**.

64.     The '306 patent relates to compositions designed to be added to fertilizers which comprise nitrification inhibitors dissolved in an organic liquid solvent system.  The '306 patent also claims methods of making such compositions for addition to fertilizers.

### b.  U.S. Patent No. 10,633,300

65.     The '300 patent is titled "Compositions and Methods Comprising Nitrification Inhibitors Containing a Mixture of Protic and Aprotic Solvent Systems."  The '300 patent was filed on May 10, 2017 and issued on April 28, 2020.  The '300 patent claims priority to April 17, 2014.  On information and belief, Defendant claims to own all rights, title, and interest in the '300 patent.  A true and correct copy of the '300 patent is attached hereto as **Exhibit F**.

66.     The '300 patent is a continuation of the application that issued as the '306 patent and is directed to substantially similar subject matter.  The '300 patent relates to a fertilizer composition comprising urea and, similar to the '306 patent, nitrification inhibitors dissolved in an organic liquid solvent system.

### 2.  The Poly (Organic Acid) Family

67.     The Poly (Organic Acid) Family generally purports to claim liquid coating formulations comprising poly (organic acids) and/or their salts dissolved in organic solvents which can then be delivered to fertilizer granules as a coating layer to increase fertilizer efficiency.  The poly (organic acids) and/or their salts are chains of molecules that are used to assist fertilizers in

releasing nutrients to the soil for plants to absorb. Organic solvents are used to dissolve and deliver the poly (organic acids) and/or their salts to evenly coat fertilizer granules before being added to soil. Solvents are selected that are environmentally safe and stable, that do not clump fertilizer granules together, and that do not degrade other additives in fertilizers. This family attempts to solve issues previously experienced by the field including issues regarding safety and toxicity, cost, storage life and stability, clumping of fertilizer granules, and degradation of urease inhibitors added to the formulations.

### a.   U.S. Patent No. 10,494,311

68.     The '311 patent is titled "Non-Aqueous Organo Liquid Delivery Systems Containing Dispersed Poly (Organic Acids) That Improve Availability of Macro and Micro-Nutrients to Plants." The '311 patent was filed on February 11, 2018 and issued on December 3, 2019. The '311 patent claims priority to May 13, 2015. On information and belief, Defendant claims to own all rights, title, and interest in the '311 patent. A true and correct copy of the '311 patent is attached hereto as **Exhibit G**.

69.     The '311 patent relates to formulations containing poly (organic acids) and/or their salts dispersed in a non-aqueous organic solvent delivery system. The water-free solvent dissolves the poly (organic acid) and/or its salt to create a liquid composition that can coat fertilizer granules.

### 3.   The Urease Inhibitor Family

70.     The Urease Inhibitor Family generally purports to claim liquid formulations comprising urease inhibitors dissolved in organic solvents, such as dimethyl sulfoxide ("DMSO"), which can be added to fertilizers to increase fertilizer efficiency. Urease inhibitors are chemical compounds that can be applied to urea-based fertilizers to slow the breakdown of urea and thus increase fertilizer efficiency. Organic solvents are used to dissolve the inhibitors and create a

composition to add to fertilizer.  Solvents are selected that are environmentally safe and stable and do not degrade the inhibitors.   This family attempts to solve issues previously experienced by the field with urease inhibitors including issues regarding safety and toxicity, cost, storage life and stability, and degradation of the urease inhibitors.

### a.  U.S. Patent No. 11,021,414

71.    The '414 patent is titled "Liquid Formulations of Urease Inhibitors for Fertilizers." The '414 patent was filed on February 24, 2020 and issued on June 1, 2021.  The '414 patent claims priority to October 1, 2012.  On information and belief, Defendant claims to own all rights, title, and interest in the '414 patent.  A true and correct copy of the '414 patent is attached hereto as **Exhibit H**.

72.    The '414 patent relates to liquid fertilizer compositions comprising phosphoramides, including N-(n-Butyl)thiophosphoric triamide ("NBPT"), dissolved in an aprotic solvent, such as DMSO, and potentially additional protic and aprotic solvents.

### COUNT I – DECLARATION OF NON-INFRINGEMENT ('306 PATENT)

73.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

74.    This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  An actual, substantial, and continuing justiciable controversy having adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Plaintiff and Defendant concerning infringement of the '306 patent.

75.    Defendant has accused Plaintiff of activities that it claims infringe the '306 patent.

76. Plaintiff does not and has not infringed, either literally or under the doctrine of equivalents, either directly or indirectly, any valid and enforceable claim of the '306 patent.

77. For example, Plaintiff does not manufacture, use, offer to sell, sell, or import a composition comprising an organic liquid solvating system comprising a protic solvent selected from the group consisting of, "a) an alcohol or polyol from the family of alkylene and poly(alkylene) glycols, b) an alkylene glycol selected from the group consisting of ethylene, propylene, and butylene glycol, c) glycerin, d) an alkylene glycol alkyl ether selected from the group comprising of dipropylene glycol methyl ether, tripropylene glycol methyl ether, and tripropylene glycol butyl ether, and e) ethyl, propyl, or butyl lactate," as required by the '306 patent.

78. Plaintiff is entitled to a declaratory judgment from this Court that it does not and has not infringed any claim of the '306 patent.

79. This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

### COUNT II – DECLARATION OF INVALIDITY ('306 PATENT)

80. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

81. The claims of the '306 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112 and/or any other judicially created requirements of patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.

18

82.     For example, the claims of the '306 patent are invalid under 35 U.S.C. § 103 because they are rendered obvious in view of the prior art.  Specifically, the claims of the '306 patent are rendered obvious by at least U.S. Patent No. 9,266,789; U.S. Patent Application Publication No. 2015/0218060; Slovakian Utility Model No. 6509; Chinese Patent No. CN101200400B; and/or prior art cited on the face of the '306 patent and during the patent's prosecution history.

83.     Plaintiff is entitled to a declaratory judgment from this Court that the '306 patent is invalid.

84.     This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

## COUNT III – DECLARATION OF NON-INFRINGEMENT ('300 PATENT)

85.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

86.     This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  An actual, substantial, and continuing justiciable controversy having adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Plaintiff and Defendant concerning infringement of the '300 patent.

87.     Defendant has accused Plaintiff of activities that it claims infringe the '300 patent.

88.     Plaintiff does not and has not infringed, either literally or under the doctrine of equivalents, either directly or indirectly, any valid and enforceable claim of the '300 patent.

19

89. For example, Plaintiff does not manufacture, use, offer to sell, sell, or import a fertilizer composition comprising a liquid fertilizer additive comprising, "a colorant, wherein the colorant comprises a powdered colorant," as required by the '300 patent.

90. Plaintiff is entitled to a declaratory judgment from this Court that it does not and has not infringed any claim of the '300 patent.

91. This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

### COUNT IV – DECLARATION OF INVALIDITY ('300 PATENT)

92. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

93. The claims of the '300 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112 and/or any other judicially created requirements of patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.

94. For example, Independent Claim 11 is invalid under 35 U.S.C. § 112 for lack of antecedent basis for "the organic liquid solvating system."

95. As another example, the claims of the '300 patent are invalid under 35 U.S.C. § 103 because they are rendered obvious in view of the prior art. Specifically, the claims of the '300 patent are rendered obvious by at least U.S. Patent No. 9,266,789; U.S. Patent Application Publication No. 2015/0218060; Slovakian Utility Model No. 6509; Chinese Patent No. CN101200400B; and/or prior art cited on the face of the '300 patent and during the patent's prosecution history.

96.     Plaintiff is entitled to a declaratory judgment from this Court that the '300 patent is invalid.

97.     This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

**COUNT V – DECLARATION OF NON-INFRINGEMENT ('311 PATENT)**

98.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

99.     This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  An actual, substantial, and continuing justiciable controversy having adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Plaintiff and Defendant concerning infringement of the '311 patent.

100.    Defendant has accused Plaintiff of activities that it claims infringe the '311 patent.

101.    Plaintiff does not and has not infringed, either literally or under the doctrine of equivalents, either directly or indirectly, any valid and enforceable claim of the '311 patent.

102.    For example, Plaintiff does not manufacture, use, offer to sell, sell, or import a composition comprising a liquid formulation comprised of, "[p]oly (organic acids), [P(OA)]s, and/or their salts . . . wherein the [P(OA)]s are homopolymers, copolymers, and/or terpolymers that are comprised of one or more monomers selected from the group consisting of: aspartic acid, glutamic acid, maleic acid, citric acid, acrylic acid, methacrylic acid, itaconic acid, and citraconic acid, their $C_{1-6}$esters, anhydrides, and imides, or their salts," as required by the '311 patent.

103.    Plaintiff is entitled to a declaratory judgment from this Court that it does not and has not infringed any claim of the '311 patent.

104.    This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

### COUNT VI – DECLARATION OF INVALIDITY ('311 PATENT)

105.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

106.    The claims of the '311 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112 and/or any other judicially created requirements of patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.

107.    For example, the claims of the '311 patent are invalid under 35 U.S.C. § 103 because they are rendered obvious in view of the prior art. Specifically, the claims of the '311 patent are rendered obvious by at least U.S. Patent Nos. 5,350,735; 5,714,558; 5,783,523; 8,025,709; and 8,357,221; and/or prior art cited on the face of the '311 patent and during the patent's prosecution history.

108.    Plaintiff is entitled to a declaratory judgment from this Court that the '311 patent is invalid.

109.    This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

### COUNT VII – DECLARATION OF NON-INFRINGEMENT ('414 PATENT)

110.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

111.    This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  An actual, substantial, and continuing justiciable controversy having adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Plaintiff and Defendant concerning infringement of the '414 patent.

112.    Defendant has accused Plaintiff of activities that it claims infringe the '414 patent.

113.    Plaintiff does not and has not infringed, either literally or under the doctrine of equivalents, either directly or indirectly, any valid and enforceable claim of the '414 patent.

114.    For example, Plaintiff does not manufacture, use, offer to sell, sell, or import a liquid fertilizer composition comprising, "one or more protic solvents selected from the group consisting of polyethylene glycols, glycerin and one or more glycerin derivatives," as required by the '414 patent.

115.    Plaintiff is entitled to a declaratory judgment from this Court that it does not and has not infringed any claim of the '414 patent.

116.    This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

### COUNT VIII – DECLARATION OF INVALIDITY ('414 PATENT)

117.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.    The claims of the '414 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112 and/or any other judicially created requirements of

patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.

119. For example, the claims of the '414 patent are invalid under 35 U.S.C. § 103 because they are rendered obvious in view of the prior art. Specifically, the claims of the '414 patent are rendered obvious by at least U.S. Patent Nos. 4,530,714 and 10,173,935; U.S. Patent Application Publication No. 2013/0145806; and Chinese Patent No. CN101200400B; and/or prior art cited on the face of the '414 patent and during the patent's prosecution history.

120. Plaintiff is entitled to a declaratory judgment from this Court that the '414 patent is invalid.

121. This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

## COUNT IX – DECLARATION OF UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT ('414 PATENT)

122. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

123. This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. An actual, substantial, and continuing justiciable controversy having adverse legal interest of sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Plaintiff and Defendant concerning infringement of the '414 patent.

124. World Source Enterprises, LLC ("World Source"), filed U.S. Patent Application No. 15/793,326 ("the '326 application") on October 25, 2017, which eventually issued as the '108 patent. On information and belief, World Source's assignment of the '108 patent to Soilgenic was recorded on July 6, 2022.

24

125.    On April 26, 2019, a petition for post-grant review of the '108 patent was filed before the PTAB.  The PTAB granted institution of PGR2019-00046 on August 13, 2019.

126.    On August 10, 2020, the PTAB issued a Final Written Decision in PGR2019-00046, finding all claims of the '108 patent unpatentable in view of the prior art.

127.    On October 8, 2020, World Source filed a Notice of Appeal of the PTAB's Final Written Decision in PGR2019-00046 to the U.S. Court of Appeals for the Federal Circuit.  On June 10, 2022, the Federal Circuit summarily affirmed the PTAB's decision under Federal Circuit Rule 36.

128.    The '108 patent and the '414 patent are related.  Both patents share the same disclosure, inventors, and prosecuting attorney(s) of record.  Both the '108 and '414 patents appear to claim priority to U.S. Patent Application No. 61/708,105, which was filed on October 1, 2012.

129.    The claims of the '108 patent and '414 patent are substantially similar.  For example, they each claim a liquid fertilizer additive solution comprising a urease inhibitor solubilized in a combination of solvents including, but not limited to, dimethyl sulfoxide and additional aprotic and/or protic solvents.

130.    Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith before the United States Patent and Trademark Office (the "USPTO"), which under 37 C.F.R. § 1.56 includes a duty to disclose all information known to that individual to be material to patentability.  This duty extends from the time the application is filed until the time the patent issues.

131.    U.S. Patent Application No. 16/799,772 ("the '772 application") was filed on February 24, 2020 and issued on June 1, 2021 as the '414 patent.  The individuals associated with the filing and prosecution of the '772 application owed a duty of candor to the USPTO.  These

25

individuals include, but are not limited to, the named inventors Gary David McKnight, David Bruce Parker, Yang Zehni, Ray Perkins, and Wei Xu (the "Inventors"); and the prosecuting attorney(s) at Ben Schroeder Law, PLLC (the "Prosecuting Attorneys").

132.    Prosecution of the '772 application was ongoing during PGR2019-00046, and continued after the PTAB's Final Written Decision issued on August 10, 2020.

133.    The decision in PGR2019-00046 finding all claims of the '108 patent unpatentable in view of the prior art is material to the patentability of the '414 patent.  The '414 patent and the '108 patent belong to the same patent family and the claims are not substantially different.  The arguments and prior art cited during PGR2019-00046 and the reasoning in the Final Written Decision are applicable to the claims of the '414 patent.

134.    A reasonable patent examiner would have considered the PTAB's Final Written Decision in PGR2019-00046 material to deciding whether to allow the claims of the '414 patent.

135.    On information and belief, the Examiner of the '772 application did not consider the PTAB's Final Written Decision in PGR2019-00046 and the Federal Circuit's decision affirming the PTAB's Final Written Decision, *see Worldsource Enters., LLC v. Vidal*, No. 2021-1041, 2022 WL 2092776 (Fed. Cir. June 10, 2022),  or any record thereof during its prosecution.

136.    On information and belief, the Final Written Decision relied on combinations of the prior art and evidence not previously considered by the Examiner during prosecution of the '772 application.  This combination of the prior art and evidence, along with the reasoning in the Final Written Decision, was not cumulative to the art of record in the prosecution of the '772 application.

137.    But for the failure to disclose the Final Written Decision issued in PGR2019-00046 to the Examiner, the '414 patent would not have issued.

26

138. The Inventors and Prosecuting Attorneys knew or should have known of the existence and contents of the Final Written Decision issued in PGR2019-00046 during the prosecution of the '772 application. The Inventors and Prosecuting Attorneys knew that the substantially similar claims of the '108 patent were deemed unpatentable in view of the prior art.

139. Despite knowledge of PGR2019-00046 and the materiality thereof to prosecution of the '772 application, the Inventors and Prosecuting Attorneys failed to disclose the result of PGR2019-00046 and the Federal Circuit's decision affirming the PTAB's Final Written Decision, *see Worldsource Enters., LLC v. Vidal*, No. 2021-1041, 2022 WL 2092776 (Fed. Cir. June 10, 2022) to the Examiner.

140. The Inventors and Prosecuting Attorneys are inventors and/or registered patent practitioners familiar with the duty of candor and good faith required under 37 C.F.R. § 1.56. The most reasonable inference from the failure to disclose the PTAB's Final Written Decision in PGR2019-00046, which invalidated all claims of a patent within the same family with the same inventors, is that the Inventors and Prosecuting Attorneys withheld this information with the specific intent to deceive the Examiner into granting the '414 patent.

141. The failure to disclose material information to the patentability of the claims of the '414 patent with the specific intent to deceive the USPTO constitutes inequitable conduct that renders the '414 patent unenforceable.

142. Plaintiff is entitled to a declaratory judgment from this Court that the '414 patent is unenforceable.

143. This is an exceptional case under 35 U.S.C. § 285, entitling Plaintiff to an award of attorneys' fees incurred in connection with this matter.

## COUNT X – VIOLATION OF NORTH CAROLINA ABUSIVE PATENT ASSERTIONS ACT
*(N.C. Gen. Stat. § 75-140 et seq.)*

144.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

145.    On information and belief, Soilgenic was formed in Delaware in 2020 as a privately-held, limited liability company with a principal place of business in St. Petersburg, Florida, and additional offices in Winston-Salem, North Carolina and High Point, North Carolina.

146.    On information and belief, Soilgenic is a non-practicing entity—meaning that it does not make, sell, offer to sell, or otherwise market or introduce into commerce, either in interstate or intrastate commerce, any product or process that practices any patent it owns.

147.    Soilgenic purports to have been assigned the patents it asserts against Synsus as part of a sale of assets from Eco in 2022.

148.    Simply put, Soilgenic does not make, sell, or offer to sell any fertilizer products. Soilgenic does not practice a single claim of any patent that it purportedly owns or licenses. Soilgenic has confirmed as much during its discussions with Synsus.

149.    Its sole business is to assert claims for patent infringement against actual participants in the fertilizer markets, such as Synsus, in the form of demand letters, threats to contact the targeted entities' customers, demands for license fees, and threats to file lawsuits against those market participants.  Soilgenic leverages those claims and threats, which are, on information and belief, often meritless and objectively baseless, to extort commercially unreasonable license fees or other monetary settlement payments from businesses that lawfully make, sell, and offer for sale fertilizer and related products.  Soilgenic has no substantial business

28

or source of revenue other than the payments it extracts from actual market participants following its assertion of, or its threats to assert, patent infringement litigation.

150.    In the summer of 2025, in a telephone communication with Synsus, Soilgenic accused Synsus of infringing its patents after Soilgenic already confronted a Synsus customer regarding the alleged infringement.  Soilgenic then threatened litigation against Synsus and Synsus's customers if Synsus and Soilgenic could not resolve this dispute.

151.    Then, on August 21, 2025, Soilgenic sent the Notice Letter to Synsus, in which it asserted that Synsus infringed some unidentified claims of 22 patents to which Soilgenic held title. The Notice Letter was sent from Soilgenic's North Carolina counsel.

152.    That Notice Letter did not identify with any degree of specificity which claims of which patents Synsus purportedly infringed.  Soilgenic only asserted its claims of infringement "on information and belief." Ex. A.

153.    After receipt of the Notice Letter, Synsus requested more information from Soilgenic concerning its infringement assertions.  Soilgenic was not forthcoming and outright refused to produce any additional information to bolster or explain its naked patent infringement assertions.

154.    In response to Synsus's September 18, 2025 Letter, on October 7, 2025, Soilgenic eventually shared with Synsus ten claim charts that it contended established infringement.  Those claim charts focused on only a portion of the patents Soilgenic claimed were infringed in its Notice Letter.  Indeed, Soilgenic has never shared claim charts or any other infringement analysis for the other patents it maintains Synsus infringes.

155. Synsus's November 14, 2025 Letter responded to the analysis contained in Soilgenic's claim charts. Synsus asserted that Soilgenic's infringement claims had no merit and that the asserted patents are invalid and/or unenforceable.

156. Ignoring the issues raised in Synsus's November 14, 2025 Letter, Soilgenic demanded a call, without counsel present, which took place on November 21, 2025. Because Synsus's November 14, 2025 Letter made clear that Soilgenic's patents were not infringed, were invalid, and/or were unenforceable, Soilgenic threatened that it would go to the market and Synsus's customers if Synsus would not take a license on Soilgenic's terms. This threat was plainly intended to convey that Soilgenic would use Synsus's customer relationships as a means to generate negotiation leverage.

157. Despite its failure to respond to Synsus's November 14, 2025 Letter, Soilgenic gave Synsus its January 5, 2026 License Offer, which is a non-exclusive licensing arrangement, under which Synsus would license four patent families in Soilgenic's patent portfolio—including patents for which Soilgenic had made nothing more than naked, conclusory assertions of infringement.

158. Following that proposal, Synsus asked Soilgenic for additional details concerning the economics of its licensing proposal—in essence, asking Soilgenic to demonstrate that the proposed licensing fee was commercially reasonable, by, among other things, providing information concerning the proposed license fee attributable to each of the four families identified in Soilgenic's proposal, and to provide the financial terms under which Soilgenic's patents have been previously licensed to other entities.

159. Soilgenic replied with its February 20, 2026 License Offer, which included a proposed term sheet and revised the upfront fee and ongoing royalty amount. But Soilgenic failed to provide the information Synsus requested that was necessary to evaluate Soilgenic's offer.

30

Rather, the term sheet called for an excessive licensing fee as an alternative to costly patent infringement litigation.

160. Thereafter, the parties spoke again and Synsus repeated its requests for information on Soilgenic's claims of infringement and licensing information.

161. On April 10, 2026, Soilgenic confirmed the financial terms of its February 20, 2026 License Offer and declared that it was non-negotiable. To date, Soilgenic has not provided the initial fees that its other licensees have paid, the specific royalty percentages, or addressed the issues Synsus raised in its November 14, 2025 Letter.

162. Soilgenic, however, has instead threatened objectively baseless litigation, threatened that it would impede Synsus's relationships with its customers or otherwise interfere with those relationships by asserting that they and Synsus infringe Soilgenic's patents. Soilgenic contended that it will only back away from those threats if, and only if, Synsus agrees to Soilgenic's commercially unreasonable licensing terms.

163. On information and belief, prior to sending the Notice Letter, Soilgenic failed to conduct an adequate analysis comparing the claims in the Asserted Patents to Synsus's products and compositions. Soilgenic's Notice Letter failed to explain how Synsus's accused products and compositions were covered by any of the patents identified in Soilgenic's Notice Letter, including the Asserted Patents. *See* N.C. Gen. Stat. § 75-143(a)(2). Soilgenic initially refused to substantiate its infringement allegations. Only after Synsus demanded, in its September 18, 2025 Letter, did Soilgenic eventually produce ten infringement claim charts. However, Soilgenic's claim charts do not address many of the patents identified in the Notice Letter.

164. In its January 5, 2026 License Offer, Soilgenic demanded that Synsus pay license fees ranging from $1 million to $1.5 million in upfront fees, plus ongoing royalties of 3% to 5%

31

of gross revenue, for a package of more than forty patents across four patent families. Soilgenic subsequently sent its February 20, 2026 License offer; that term sheet included with that offer demanded a one-time fee of $1.5 million plus a royalty of 3% of gross sales. The February 20, 2026 License offer included a license to a patent family that is of no relevance to Synsus. On April 10, 2026, Soilgenic confirmed that the terms of its February 20, 2026 License offer are non-negotiable. Accordingly, Soilgenic's demands are unreasonable. In addition, Soilgenic continues to refuse to provide the financial terms of its three existing non-exclusive license agreements. *See id.* § 75-143(a)(4). The assertions of patent infringement set forth in the Notice Letter and in Soilgenic's subsequent claim charts are objectively meritless and Soilgenic knew or should have known that those assertions were meritless. Synsus's November 14, 2025 Letter explained how Soilgenic has no viable claim of patent infringement. *See id.* § 75-143(a)(6)–(7).

165. The Notice Letter and subsequent licensing demands are deceptive in that they fail to disclose the true nature and history of the patents that were identified. Specifically, Soilgenic failed to disclose that the '108 patent, which is related to several of the 22 identified patents, was found invalid by the PTAB in PGR2019-00046, and that the PTAB's decision was affirmed on appeal by the Federal Circuit. *See id.* § 75-143(a)(6)–(7).

166. The claims of several of the patents identified in the Notice Letter are materially similar to the invalidated claims of the '108 patent, yet Soilgenic failed to disclose this material information to Synsus and instead included these related patents in its licensing demands. Moreover, Soilgenic and/or its predecessors had a duty to inform the U.S. Patent and Trademark Office of the PTAB's and Federal Circuit's invalidity decisions, yet those decisions were never disclosed to the USPTO, which renders several of the patents identified in Soilgenic's Notice

32

Letter, January 5, 2026 License Offer, and February 20, 2026 License Offer unenforceable, yet Soilgenic demands that Synsus pay for a license to these patents. *See id.*

167.    Soilgenic's refusal to answer any of Synsus's reasonable requests for information concerning Soilgenic's allegations of infringement, constitute abusive patent assertions, for at least the following reasons: Soilgenic's demands did not identify the specific claims infringed for many of the 13 asserted patents, N.C. Gen. Stat. § 75-143(a)(1)(c); Soilgenic failed to perform a complete analysis comparing the claims of the asserted patents to Synsus's accused products, N.C. Gen. Stat. § 75-143(a)(2); Soilgenic has repeatedly failed to communicate the information concerning which claims of the patents it claims are infringed are practiced by any accused product in the appropriate level of detail, despite Synsus's repeated requests for such information, N.C. Gen. Stat. § 75-143(a)(3); Soilgenic's demand for a license fee for its entire patent portfolio, in the non-negotiable amount of $1,500,000 and 3% of revenue, is not based on a reasonable estimate of the value of the license, especially because the demanded license includes patents that Synsus does not practice, and for which Soilgenic has never produced any evidence that Synsus practices, N.C. Gen. Stat. § 75-143(a)(5); Soilgenic knows, or should have known, that its threatened claims of infringement are meritless, because Synsus does not practice the claims of each of the 22 asserted patents, and because several of those 22 patents are invalid or unenforceable, as Synsus explained in its November 14, 2025 Letter, N.C. Gen. Stat. § 75-143(a)(6); the threatened claims of patent infringement lack sufficient allegations concerning what specific claims of the asserted patents, if any, Synsus is alleged to have infringed, N.C. Gen. Stat. § 75-143(a)(8); and Soilgenic is aware of the PTAB's decision that plainly invalidates a patent related to many of the patents that Soilgenic continues to assert against Synsus, N.C. Gen. Stat. § 75-143(a)(10).

168.    Soilgenic's assertions of patent infringement, and its demands for an expansive and commercially unreasonable license, are abusive and made in bad faith.

169.    As a result of, and in reliance on, Soilgenic's objectively baseless and subjectively bad faith and abusive assertion of Synsus's patent infringement in and subsequent to the Notice Letter, Synsus has been aggrieved by Soilgenic's conduct. *See id.* § 75-145(b).

170.    Synsus has suffered damages and incurred costs, fees, and other harm, all of which are recoverable under the North Carolina Abusive Patent Assertions Act. *See id.* § 75-145(b)(1)– (3).

171.    As a result of and in reliance on Soilgenic's bad faith infringement claims, Synsus was forced to divert resources from operating its business to address Soilgenic's claims, including by spending numerous hours researching and reviewing the allegations, engaging and corresponding with attorneys to investigate Soilgenic's claims, analyzing the ten claim charts that Soilgenic eventually produced, evaluating the 22 identified patents initially identified in the Notice Letter from a technical level in light of Synsus's products and technology, and defending against Soilgenic's objectively baseless and bad faith and abusive assertions of patent infringement. These diversions were all proximately caused by Soilgenic's bad acts and have caused a significant burden on Synsus.

172.    Synsus, therefore, seeks (a) equitable relief enjoining Soilgenic from asserting against Synsus any of the patents identified in Soilgenic's Notice Letter, in its January 5, 2026 License Offer, and its February 20, 2026 License offer, (b) equitable relief enjoining Soilgenic from contacting Synsus's customers concerning infringement of any of the patents identified in Soilgenic's Notice Letter, in its January 5, 2026 License Offer, and its February 20, 2026 License offer, and (c) recovery of Synsus's damages, costs, and fees, in an amount to be proven at trial,

together with an award of exemplary damages in an amount equal to $50,000 or three times the total of damages, costs, and fees, whichever is greater.  *See id.* § 75-145(b)(1)–(4).

## COUNT XI – VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
*(N.C. Gen. Stat. § 75-1.1)*

173.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

174.    Soilgenic—a non-practicing entity whose sole business is to assert claims for patent infringement against actual participants in the fertilizer markets—has contacted one of Synsus's customers and has threatened to confront Synsus's customers directly alleging the products they purchase from Synsus are infringing Soilgenic's patents, if Synsus did not agree to accept Soilgenic's non-negotiable February 20, 2026 License Offer.  This further underscores that Soilgenic's scheme is extortionate, and not a reasonable and commercially defensible effort to lawfully enforce valid patent claims.

175.    More specifically, Soilgenic has asserted that Synsus's customers and prospective customers infringe the Asserted Patents by buying, using, offering for sale, or selling Synsus's products; that Synsus's customers and prospective customers need a license under the Asserted Patents and Soilgenic's other patents; and that Synsus's customers and prospective customers have legal risk for infringement of the Asserted Patents, and Soilgenic's other patents, based on purchasing Synsus's products.  These assertions are objectively baseless and made in bad faith.

176.    Soilgenic has already contacted one of Synsus's customers and has threatened to go after Synsus's customers directly and assert that they are infringing Soilgenic's patents in connection with their purchase and use of Synsus's products, in an effort to coerce Synsus into accepting an unreasonable and non-negotiable license.  On information and belief, Eco, Soilgenic's

alleged predecessor, also engaged in similar conduct, including by making bad-faith statements to a competitor's customers about alleged patent infringement.

177. Soilgenic's conduct harms commerce in North Carolina. Its unscrupulous and unfair conduct—by demanding an unreasonably priced license and threatening to accuse Synsus and its customers, who are actual market participants, of infringement, for example—dampens competition in North Carolina.

178. Soilgenic's bad-faith course of conduct has caused Synsus to expend a great deal of time and resources in futile discussions and negotiations, as demonstrated in email communications and in phone calls between the two entities. Synsus attempted, in good faith, to address any claimed infringements with Soilgenic between August of 2025 through April of 2026. During those discussions, Soilgenic:

- threatened litigation unprompted and in the middle of good faith discussions despite the parties' attempt to work more productively;

- issued veiled threats of business disruptions *i.e.*, threats to harm Synsus's business operations and customer relationships; and

- refused to timely respond to Synsus's inquiries, address analysis shared by Synsus that contradicted Soilgenic's claims, and deployed various other bad-faith tactics aimed at disrupting Synsus's operations.

179. Soilgenic's conduct in violation of N.C. Gen. Stat. § 75-140 *et seq.* is a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

180. Soilgenic's conduct constitutes (a) unfair methods of competition in or affecting commerce and/or (b) unfair or deceptive acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1(a).

181. As a direct and proximate result of the foregoing violations of N.C. Gen. Stat. § 75-1.1, Synsus has been and is being injured, and is entitled to recover damages from Soilgenic.

182. Synsus, therefore, seeks (a) monetary damages in an amount to be determined at trial, to have those damages trebled pursuant to N.C. Gen. Stat. § 75-16, and (b) to have and recover its attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

### PRAYER FOR RELIEF

Synsus respectfully requests that this Court grant judgment and relief as follows:

(a) A declaration that Synsus does not infringe any claim of the '306 patent, either literally or under the doctrine of equivalents;

(b) A declaration that Synsus does not infringe any claim of the '300 patent, either literally or under the doctrine of equivalents;

(c) A declaration that Synsus does not infringe any claim of the '311 patent, either literally or under the doctrine of equivalents;

(d) A declaration that Synsus does not infringe any claim of the '414 patent, either literally or under the doctrine of equivalents;

(e) A declaration that the claims of the '306 patent are invalid;

(f) A declaration that the claims of the '300 patent are invalid;

(g) A declaration that the claims of the '311 patent are invalid;

(h) A declaration that the claims of the '414 patent are invalid;

(i) A declaration that the claims of the '414 patent are unenforceable;

(j) A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

(k)     Damages sufficient to compensate Synsus for Soilgenic's violation of the North Carolina Abusive Patent Assertions Act, including an award of exemplary damages in an amount equal to $50,000 or treble damages, whichever is greater;

(l)     An order requiring Soilgenic to post a bond in an amount equal to a good-faith estimate of Synsus's fees and costs to litigate its claim and the amount reasonably likely to be recovered, pursuant to N.C. Gen. Stat. § 75-144;

(m)     Damages sufficient to compensate Synsus for Soilgenic's violation of the North Carolina Unfair and Deceptive Trade Practices Act, including an award of treble damages pursuant to N.C. Gen. Stat. § 75-16;

(n)     Attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1;

(o)     Injunctive relief, including a preliminary injunction, prohibiting Soilgenic from asserting any of the patents identified in the Notice Letter against Synsus;

(p)     Injunctive relief, including a preliminary injunction, prohibiting Soilgenic from contacting any of Synsus's customers or prospective customers concerning the patents identified in the Notice Letter;

(q)     Costs and expenses in this action;

(r)     Pre-judgment and post-judgment interest; and

(s)     Such other and further relief as this Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Aliza George Carrano
Dane Sowers
Autumn Klein
WILLKIE FARR & GALLAGHER LLP
1875 K St NW
Washington, DC 2006
(202) 303-1000

Matthew Freimuth
Nicholas Scambia
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Aaron J. Hersh
Jordan Katz
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Dr.
Chicago, IL 60654
(312) 728-9000

April 10, 2026

_____
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff Synsus Private Label Partners, LLC*